**NO. 25-4699**

# United States Court of Appeals
*for the*
# Fourth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

– v. –

CORTEZ DAYSHAWN BUMPHUS, a/k/a Co, a/k/a Cortez Bumphus,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA, NEWPORT NEWS DIVISION

# OPENING BRIEF OF APPELLANT

SICILIA C. ENGLERT
LAW OFFICE OF
SICILIA C. ENGLERT, LLC
1800 Diagonal Road, Suite 600
Alexandria, Virginia 22314
(703) 636-2261

*Counsel for Defendant-Appellant*

COUNSEL PRESS
A Proceed Service
The Appellate Experts®
(800) 4-APPEAL • (815680)

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..... iii

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION ..... 1

STATEMENT OF THE ISSUES ..... 1

STATEMENT OF THE CASE AND FACTS ..... 2

I. Overview of the Government's drug trafficking investigation ..... 2

II. Bumphus's convictions and appellate issues ..... 3

III. Facts specific to Bumphus's appeal ..... 4

IV. Motion for judgment of acquittal, jury instructions, and verdict ..... 14

V. Post-trial motions and sentencing ..... 14

SUMMARY OF THE ARGUMENT ..... 16

ARGUMENT ..... 18

I. The evidence was insufficient to show that Bumphus organized, supervised, or otherwise managed, five or more people with whom he was acting in concert to distribute marijuana ..... 18

A. Standard of Review ..... 18

B. Elements of Continuing Criminal Enterprise ..... 19

C. The trial court erred in finding that Bumphus organized, supervised, or managed five or more people ..... 22

II. Bumphus's conviction for Continuing Criminal Enterprise should be reversed because the district court refused to instruct the jury that it had to unanimously agree as to which five people Bumphus organized, supervised, or managed ..... 30

A. Standard of Review ..... 30

B. The district court committed reversible error by refusing Bumphus's request for a unanimity instruction ..... 31

III. Bumphus's two §924(c) convictions and sentences violate the Double Jeopardy Clause because both are predicated on the same drug trafficking offense ....................36

A. Standard of Review ....................36

B. Double Jeopardy and Statutory Interpretation ....................36

C. The Fourth Circuit's Interpretation of §924(c) ....................38

D. Bumphus was erroneously convicted and sentenced for two §924(c) convictions predicated on the same underlying drug trafficking offense ....................41

1. *Camps* is inapplicable to Bumphus's §924(c) convictions for possession of a firearm in furtherance of drug trafficking because the statute did not criminalize possession when *Camps* was decided ....................43

2. *Camps* does not mandate two consecutive sentences for simultaneous possession of two firearms under §924(c) ....................46

3. This Court should revisit its ruling in *Camps*, rejected by ten sister circuits, upholding multiple convictions or sentences under 924(c), predicated by one underlying drug trafficking crime ....................47

CONCLUSION ....................54

REQUEST FOR ORAL ARGUMENT ....................54

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Bailey v. United States*,
516 U.S. 137 (1995)....................43

*Bell v. United States*,
349 U.S. 81 (1955).................... 38, 52

*Blockbuger v. United States*,
284 U.S. 299 (1932).................... 37, 40

*Brown v. Ohio*,
432 U.S. 161 (1977)....................37

*Cleaveland v. United States*,
531 U.S. 12 (2000)....................52

*Glasser v. United States*,
315 U.S. 60 (1942)....................18

*Hahn v. Moseley*,
931 F.3d 295 (4th Cir. 2019)....................50

*Jackson v. Virginia*,
443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979).................... 18-19

*Jones v. Thomas*,
491 U.S. 376 (1989)....................37

*Richardson v. United States*,
526 U.S. 813 (1999).................... 31-32, 33

*United States v. Anderson*,
59 F.3d 1323 (D.C. Cir.) (en banc), *cert. denied*,
516 U.S. 999 (1995).................... 49, 52, 53

*United States v. Baugham*,
449 F.3d 167 (D.C. Cir. 2006)....................20

*United States v. Bennafield*,
287 F.3d 320 (4th Cir. 2002)....................38

*United States v. Burgos*,
94 F.3d 849 (4th Cir. 1996)....................18

*United States v. Butler*,
885 F.2d 195 (4th Cir. 1989) .................................................... 19, 20

*United States v. Camps*,
32 F.3d 102 (4th Cir. 1994), *cert. denied*, 513 U.S. 1158 (1995) ......... *passim*

*United States v. Cappas*,
29 F.3d 1187 (7th Cir. 1994) .........................................................48

*United States v. Diaz*,
592 F.3d 467 (3d Cir. 2010) .................................................... 48, 50

*United States v. Dunford*,
148 F.3d 385 (4th Cir. 1998) .................................................... 44, 45

*United States v. Eiland*,
738 F.3d 338 (4th Cir. 2013) .........................................................20

*United States v. Garcia Abrego*,
141 F.3d 142 (5th Cir. 1998) .........................................................33

*United States v. Goodine*,
400 F.3d 202 (4th Cir. 2005) .........................................................36

*United States v. Grimes*,
702 F.3d 460 (8th Cir. 2012) .................................................... 37, 38

*United States v. Gugliemi*,
819 F.2d 451 (4th Cir. 1987) .........................................................53

*United States v. Hall*,
93 F.3d 126 (4th Cir. 1996) ............................................... 21, 22, 28

*United States v. Hall*,
972 F.2d 67 (4th Cir. 1992) ...........................................................36

*United States v. Hamilton*,
953 F.2d 1344 (11th Cir. 1992) .....................................................49

*United States v. Harris*,
209 F.3d 156 (2d Cir. 2000) ...........................................................33

*United States v. Hassler*,
992 F.3d 243 (4th Cir. 2021) ............................................... 30, 31, 35

*United States v. Heater*,
63 F.3d 311 (4th Cir. 1995) ...........................................................20

*United States v. Hernandez-Vega*,
235 F.3d 705 (1st Cir. 2000)....................................................................33

*United States v. Jerome*,
942 F.2d 1328 (9th Cir. 1991) ........................................................... 35, 36

*United States v. Johnson*,
54 F.3d 1150 (4th Cir. 1995) ............................................................ 18, 19

*United States v. Kellam*,
568 F.3d 125 (4th Cir. 2009) ..................................................................18

*United States v. Khan*,
461 F.3d 477 (4th Cir. 2006), *cert. denied*, 550 U.S. 956 (2007) .... 41, 49, 50

*United States v. Lanier*,
520 U.S. 259 (1997)..................................................................................38

*United States v. Lindsay*,
985 F.2d 666 (2d Circuit 1993), *cert. denied*, 510 U.S. 832 (1993) ..... *passim*

*United States v. Lomax*,
293 F.3d 701 (4th Cir. 2002) ..................................................................43

*United States v. Long*,
190 F.3d 471 (6th Cir. 1999) ..................................................................33

*United States v. Lucas*,
932 F.2d 1210 (8th Cir. 1991) ................................................................47

*United States v. Miltier*,
882 F.3d 81 (4th Cir. 2018) ............................................................. 30, 31

*United States v. Mitchell*,
39 F.3d 465 (4th Cir. 1994) ....................................................................36

*United States v. Pena-Lora*,
225 F.3d 17 (1st Cir. 2000).....................................................................48

*United States v. Privette*,
947 F.2d 1259 (5th Cir. 1991), *cert. denied*, 503 U.S. 912 (1992) ...............48

*United States v. Rea*,
621 F.3d 595 (7th Cir. 2010) ..................................................................33

*United States v. Rentz*,
777 F.3d 1105 (10th Cir. 2015) (en banc) ............................................ *passim*

*United States v. Ricks*,
882 F.2d 885 (4th Cir. 1989) ....................................................................20

*United States v. Roane*,
378 F.3d 382 (4th Cir. 2004) ........................................................ 31, 33, 34, 35

*United States v. Rockelman*,
49 F.3d 418 (8th Cir. 1995) ......................................................................33

*United States v. Rutledge*,
517 U.S. 282 (1996)..................................................................... 15, 20

*United States v. Shrader*,
675 F.3d 300 (4th Cir. 2012) ........................................................... 36, 38

*United States v. Silvers*,
90 F.3d 95 (4th Cir. 1996) ........................................................................15

*United States v. Smith*,
451 F.3d 209 (4th Cir. 2006) ........................................................... 18, 19

*United States v. Smith*,
924 F.2d 889 (9th Cir. 1991) ....................................................................48

*United States v. Stitt*,
250 F.3d 878 (4th Cir. 2001) ........................................................... *passim*

*United States v. Taylor*,
13 F.3d 986 (6th Cir. 1994) ............................................................. 40, 48

*United States v. Weathers*,
186 F.3d 948 (D.C. Cir. 1999)...................................................................37

*United States v. Woerner*,
709 F.3d 527 (5th Cir. 2013) ....................................................................38

*United States v. Zelaya*,
908 F.3d 920 (4th Cir. 2018) ....................................................................18

**Statutes & Other Authorities:**

U.S. Const. amend. V.......................................................................... 14, 36

U.S. Const. amend. VI ...........................................................................34

18 U.S.C. §922(g) ................................................................... 44, 45, 46

18 U.S.C. §922(g)(1)............................................................................1

18 U.S.C. §924(a)(2) ........ 1
18 U.S.C. §924(c) ........ *passim*
18 U.S.C. §924(c)(1) ........ *passim*
18 U.S.C. §924(c)(1)(A) ........ 38, 39
18 U.S.C. §1956(h) ........ 1
18 U.S.C. §3231 ........ 1
21 U.S.C. §841(a)(1) ........ 1
21 U.S.C. §841(b)(1) ........ 1
21 U.S.C. §843(b) ........ 1
21 U.S.C. §843(d)(1) ........ 1
21 U.S.C. §846 ........ 20
21 U.S.C. §848 ........ 19, 20
21 U.S.C. §848(a) ........ 1, 33, 35
21 U.S.C. §848(c) ........ *passim*
21 U.S.C. §856(a)(2) ........ 1
21 U.S.C. §856(b) ........ 1
28 U.S.C. §1291 ........ 1
28 U.S.C. §2255 ........ 34, 50
Federal Rules of Criminal Procedure Rule 52(b) ........ 34
Pub. L. No. 105-386 ........ 39, 43
U.S.S.G. §3C1.1 ........ 16

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

Appellant, Cortez Bumphus, was convicted in the United States District Court for the Eastern District of Virginia, of engaging in a continuing criminal enterprise in violation of 21 U.S.C. §848(a), conspiracy to launder money in violation of 18 U.S.C. §1956(h), possession with intent to distribute marijuana in violation of 21 U.S.C. §841(a)(1) and §841(b)(1), being a felon in possession of a firearm in violation of 18 U.S.C. §922(g)(1) and §924(a)(2), possession of a firearm in furtherance of drug trafficking in violation of 18 U.S.C. §924(c), maintaining a drug involved premises in violation of 21 U.S.C. §856(a)(2) and (b), and use of a communication facility in furtherance of drug trafficking in violation of 21 U.S.C. §843(b) and (d)(1). Following the district court's judgment on December 12, 2025, a timely notice of appeal was filed on December 16, 2025. The district court had jurisdiction pursuant to 18 U.S.C. § 3231, and this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I. Whether the evidence was insufficient to convict Bumphus for engaging in a continuing criminal enterprise where the Government failed to prove the essential element that such enterprise was undertaken in concert with five or more other persons with respect to whom Bumphus was an organizer, in a supervisory position, or any other position of management?

II. Whether the district court committed reversible error by failing to instruct the jury that, in order to convict Bumphus of engaging in a continuing criminal enterprise, it had to unanimously agree as to which five people Bumphus organized, supervised, or managed?

III. Whether one of Bumphus's two 18 U.S.C. §924(c) convictions, for possession of a firearm in furtherance of a drug trafficking crime, must be vacated because both are predicated on the same drug trafficking offense in violation of the Double Jeopardy Clause?

## STATEMENT OF THE CASE AND FACTS

### I. Overview of the Government's drug trafficking investigation

In the summer of 2021, federal law enforcement officials received information about drug trafficking activity at Lux Auto, a car dealership in Newport News. JA1645. Federal Bureau of Investigation (FBI) agents set up surveillance cameras at Lux Auto and a self-storage unit for approximately two years, JA1748-1749, which revealed suitcases of suspected marijuana being trafficked and stored. JA1771-1772, JA1781. Between March 2022 and July 2023, law enforcement obtained wiretaps on 10 phone lines. JA2109-2110. Agents also uncovered more than $22M flowing in and out of accounts of suspected perpetrators over the course of four years. JA2705. Through information from wire and data intercepts, agents conducted targeted interdiction operations at Mid-Atlantic airports, seizing large amounts of marijuana

and cash being transported in suitcases. The investigation revealed that, on a monthly basis, hundreds of pounds of marijuana were purchased in California, packaged into one-pound vacuum sealed bags, and carried in suitcases to Virginia by individuals flying on commercial airlines. Flyers were paid approximately $1,500 to $2,000 to fly with the marijuana. JA1419, JA1424, JA2232. After the suitcases were emptied of marijuana, the flyers carried cash back to California. JA2237.

The final charging document, the Second Superseding Indictment, charged 26 defendants with various drug trafficking related offenses in a 127-count indictment. Five defendants—Cortez Bumphus, Dontae Dozier, Dilquon Best, Robert Moses, and Zuri Reeves, were charged with engaging in a Continuing Criminal Enterprise (CCE). Four defendants proceeded to trial—Cortez Bumphus, Dilquon Best, Kamani Johnson, and Ervin Moore.

## II. Bumphus's convictions and appellate issues

Bumphus was charged in 13 of the 127 counts in the Second Superseding Indictment and convicted of the following: engaging in a CCE (Count 1), conspiracy to distribute 1,000 kilograms or more of marijuana (Count 2), conspiracy to launder money (Count 3), possession with intent to distribute marijuana (Counts 12 and 15), unlawful possession of a firearm by a felon (Count 16), possession of a firearm in furtherance of a drug trafficking crime (Counts 17, and 19), maintaining a drug-

involved premises (Count 20), and use of a communication facility in furtherance of drug trafficking (Count 21).[1] JA97.

In this appeal, Bumphus raises three issues: (1) the Government's evidence was insufficient to prove an essential element of CCE—that he organized, supervised, or otherwise managed, five or more people in the conspiracy; (2) the trial court erred in rejecting Bumphus's proposed instruction that the jury had to unanimously agree on the specific five people he organized, supervised, or otherwise managed; and (3) Bumphus's convictions and sentences for two counts of violating 18 U.S.C. §924(c), based on the same underlying offense, violates the Fifth Amendment's Double Jeopardy Clause.

## III. Facts specific to Bumphus's appeal

The Government presented evidence that Best, Bumphus, and Reeves, purchased marijuana in California and paid people ("flyers") to take commercial flights to Virginia with suitcases packed with marijuana. During the seven years of the charged conspiracy, the relationships between Best, Bumphus, and Reeves, changed significantly. Best was incarcerated for approximately one year, after which

[1] The jury found Bumphus not guilty of: possession with intent to distribute oxycodone (Count 13), possession with intent to distribute Psilocybin (Count 14), and possession of a firearm in furtherance of a drug trafficking crime (Count 18). The trial court dismissed Count 2 (conspiracy), because it was a lesser included offense of Count 1.

Reeves severed ties with him. Similarly, Bumphus was incarcerated for two years, after which Reeves had only a buyer-seller relationship with Bumphus. The relationships between Best, Bumphus, and Reeves, evolved through five major phases.

*Phase one – Best, Bumphus, Reeves, working together (2017 - 2019)*

The Government's first witness was Dana Dasher, who grew marijuana plants in his garage in southern California, producing approximately 8-10 pounds of marijuana every three months. JA843-848. In 2017, he met Dilquon Best ("Q"), who purchased his entire crop. JA856, JA884. After the first sale, Best found a bigger supplier in Los Angeles, but maintained a relationship with Dasher, paying him to drive and do odd jobs. JA856, JA865, JA1038. Best, who did not have a driver's license, asked Dasher to drive him to and from a dispensary in Los Angeles, where Best would purchase marijuana packaged in one-pound quantities in "turkey bags." JA1060-1064. Best continued to purchase marijuana from the Los Angeles supplier for the next seven years. JA1066. Approximately one year after buying marijuana from the Los Angeles supplier, Best also began buying marijuana from a supplier in Sacramento. JA878.

Four to twelve months after meeting Best, Dasher met Bumphus ("Co"), who came from Virginia to purchase marijuana. JA880, JA911. Bumphus was Best's good friend, with whom Best had grown up. JA876. Bumphus got his "own pounds"

of marijuana "from Q or from Q's people." JA876. In addition to buying marijuana from Best, Bumphus also bought directly from the Sacramento supplier. JA916. According to Dasher, "Q had his own supplier he would go to. And then they also had a supplier they went to together." JA916.

Dasher became increasingly integrated into Best's marijuana business, helping to repackage marijuana into double vacuum sealed bags, and packing those bags those into suitcases with clothing. JA870-872, JA883. Dasher also arranged flyers to take suitcases of marijuana on commercial flights to Virginia. JA887-888. Flyers were often college kids or people who needed extra money, and they were paid up to $2,000 to make the trip. JA887.

Later, Best and Bumphus were joined by Zuri Reeves ("ZuWaap"), who also purchased marijuana from California. Reeves testified that his mother's husband is related to Best, who he had known since the age of 15. Reeves met Bumphus independently in 2018 while shooting dice in Hampton, Virginia. JA1027-1028, JA1030-1031. At the end of 2018 or beginning of 2019, Reeves went to California to purchase marijuana from someone he knew. He discovered that Bumphus and Best were friends. JA1033. During that trip, the three of them purchased marijuana using their own money, and not as a collective. JA1142-1143, JA1147. They divided the marijuana, with each person taking what they had bought. JA1065, JA1148.

Subsequently, Reeves, Bumphus, and Best, pooled their money to buy marijuana, JA1045, JA1149. Best's role was to receive the money, go with them to choose the marijuana, and send it to Virginia via flyers. JA1047-1048. In Virginia, the flyer would take a taxi or Uber to a safe house. JA1049-1050. At the designated location, they split it up the marijuana, and sold it. JA1048-1051. After selling the marijuana, they put the money together and bought more marijuana. JA1051-1052.

One of the people who purchased the marijuana in Virginia was Dontae Dozier, the owner of Lux Auto. Dozier testified that when he opened Lux Auto in 2018, business was slow, so he started selling five to ten pounds of marijuana per week. JA1649. Subsequently, his cousin, Freddie Moore ("Goons"), introduced him to Best, from whom he ordered larger amounts, but no more than 100 pounds every two weeks. JA1651-1054. Approximately six months after his first order, Dozier flew to California to meet Best, and they discussed marijuana types and prices. JA1656, JA1658. Best also visited Lux Auto in Virginia, where he purchased two cars and where he also came to socialize. JA1660-1662. The marijuana was delivered to Dozier by Bumphus and other random people. JA1657-1658.

People came to Lux Auto to socialize, and not necessarily to sell drugs. JA951, JA1690-1691. In fact, Dozier did not allow anyone other than himself and Moore to sell marijuana there. JA1714. Several times per week, Bumphus would come to "[s]it around and just chill" JA1460-1461, JA1671. Occasionally, Bumphus would deliver

marijuana. JA1460. However, when it came to purchasing marijuana, Dozier talked to Best, because Bumphus "wasn't the person I needed to talk to." JA1671.

*Phase Two—Best incarcerated (December 2019)*

Best was incarcerated for approximately one year starting in December of 2019. JA1055. With Best gone, Reeves and Bumphus had to do more work. JA1055, JA1218. Reeves managed the flyers and also brought in more people. This included Damian Gay ("Hatch"), Carl Mitchell ("Lil Man"), and Kamani Johnson ("Kazz"). JA1066, JA1156. Reeves testified that they kept the money together for all three of them and bought marijuana. JA1230. Bumphus, however, did not communicate with any of the flyers and was not interested in choosing marijuana. JA1071, JA1156, JA1165-1166. It was around this time that Reeves took over supplying marijuana to Dozier. JA1058, JA1125-1126.

In Virginia, Reeves worked with Johnson, Gay, and Schlosser-Goodman ("Nasty") to distribute marijuana. JA1239. Reeves clarified that "working with" did not mean "working for." Thus, Gay did not work for him; rather, Reeves was helping Gay to establish his own marijuana business. JA1240. Likewise, Mitchell worked for Duwan King, who was also shipping marijuana from Los Angeles to Virginia. JA1241-1242.

Dasher testified that during Best's incarceration, Reeves and two of his cousins would purchase up to 300 pounds from Sacramento and 150-200 pounds

from the Los Angeles dispensary, totaling approximately 450 pounds every two to three weeks. JA882-884.

*Phase Three—Bumphus incarcerated (October 2020 - October 2022)*

Bumphus was incarcerated for two years, from October 2020 to October 2022. During Bumphus's incarceration, Reeves increased the amount of marijuana sent to Virginia. JA1120-1121. Reeves continued to sell marijuana to Dozier, who received the marijuana at Lux Auto. JA1073. In the summer of 2021, authorities began investigating, JA2795, and 10 of the 14 Airport interdictions occurred while Bumphus was incarcerated.

*Phase Four—Best released and Reeves severs ties (2021)*

When Best was released from jail in 2021, he and Reeves had a falling out. Best wanted to keep everything between the three of them and disagreed with Reeves showing his friends how he made money by selling marijuana. JA1074-1075. Reeves gave Best all of his money and severed ties. JA1244-1248. Thereafter, Best and Reeves each used their own flyers to transport marijuana to Virginia. JA886-887. Dasher confirmed that Reeves "had to find his own way and his own people to get them [marijuana] back." JA886. Best also convinced Dozier to switch back to buying marijuana from him instead of Reeves. JA1665-1666. Dozier still bought marijuana from other Virginia suppliers such as "Twon" and Dave. JA1708-1710.

*Phase Five—Bumphus released from jail (October 2022)*

When Bumphus was released, Reeves was no longer in business with him. JA1074. Bumphus observed and hung out for a few months, and then started selling again. JA1074. Reeves became Bumphus's supplier, but they did not resume their prior relationship. JA1129, JA1167.

At the end of December, 2022, Bumphus, Best, Dozier, Reeves, and others, went on a New Years Eve boys' trip to Miami. JA1676. Dozier paid to rent a mansion for three or four days. JA1677-1678. In early 2023, Dozier started gambling and no longer paid attention to his marijuana and auto businesses. JA1679.

Outside of witness testimony, most of the evidence against Bumphus was dated after his release in October of 2022. Four airport interdictions occurred during this time, in 2023. The Government also presented surveillance videos of Bumphus at Lux Auto in 2023. Two videos showed Bumphus selling user quantities of marijuana, JA1790, Ex. 0527; JA1814, Ex. 0562. Other videos showed Bumphus socializing or sometimes carrying a string or duffle bag. JA1803, Ex. 0542; JA1807, Ex. 0544; JA1832, Ex. 0573.

*Bumphus is arrested*

On July 5, 2023, the same the day a search warrant was executed on the townhouse at 5124 Goldsboro Drive in Hampton, Virginia, surveillance videos showed Bumphus, Najae Vaughn, Brooklyn Martin, and Jamonte Stephens, each

with backpacks, entering the townhouse. Stephens also carried a large duffle bag. JA1837-1838, Ex. 0581.

When the search warrant was executed, Bumphus, Stephens, and Vaughn, ran out of the back and were taken into custody. JA2386. Jamonte Stephens was carrying a multicolored backpack containing a loaded Ruger handgun, suspected marijuana, a few pills, and cash. JA2386-2387, JA2392.

Inside, agents found evidence of drug trafficking—including distribution and user quantities of suspected marijuana, numerous suitcases, vacuum seal bags, and scales. Agents recovered 33 bags of suspected marijuana and approximately $34,000. JA2475-2483. Agents also seized two Glock pistols inside the residence. JA2473-2474, JA2481. One pistol was in the living room under a couch cushion. JA2474. The other was on a kitchen table. Defense Ex. 116. Agents found a Virginia identification card for Bumphus with an address different from the Goldsboro residence. JA2480, Ex. 1249. They also seized a baggie with a white pill, and a prescription-style bottle labeled with promethazine. JA2481.

The residence contained a playset, children's shoes, children's items, and woman's purses. JA2472, JA2509, JA2511-2512. A FedEx package was addressed to Danielle Hartless at the Goldsboro address. JA2480.

Danielle Hartless testified that she had lived at the Goldsboro Drive townhouse with her children for seven years, until she moved out in May 2023.

JA2307. She renewed the lease from May 8, 2023, to May 7, 2024, intending to let her daughter take over the lease in June 2023. JA2307. However, this plan fell through. JA2308.

Hartless had a romantic relationship with Bumphus, which ended by the time she moved out. JA2308-2309. When her daughter did not take over the lease, she allowed Bumphus to use the townhouse. JA2308. A lot of her property remained there, which she had intended to retrieve when her daughter moved in. JA2316.

On the day of Bumphus's arrest, officers also executed a search warrant on 120 Dorothy Drive, a single-family home in Yorktown, Virginia. JA2415, JA2417, JA2461. No one was there at the time. JA2418. Upon entering, agents found evidence of marijuana trafficking—including suitcases, nine bulk packages of suspected marijuana, JA2429, JA3981, smaller packages of marijuana, a ledger notebook JA2433, and a baggage claim tag with Bumphus's name for a flight between Los Angeles and Washington D.C., dated in April 2020. JA2427. Inside a desk, agents found a Smith & Wesson pistol and approximately $27,000. JA2435. Agents also found lease documents in the name of Camille Smith. JA2434.

Best's girlfriend, Camile Smith, testified that it was her idea to rent the Dorothy Drive house so that she and Best could stay there when they visited Best's family, about once a month. JA2357-2360. She had known Bumphus for about ten years and he ended up living in the Dorothy Drive house. JA2357-2358.

*Bumphus's telephone conversations*

The Government introduced Bumphus's telephone conversations from May, June, and July of 2023, which included: discussing the sale of a couple of pounds of marijuana (June 22, 2023), JA1986; discussing the price of marijuana (July 5, 2023), JA1990-1991; and discussing prices for different strains of marijuana (July 5, 2023), JA1991-1993, JA3912.

Three phone calls were used as evidence for the CCE's requirement that Bumphus supervised or managed at least five people. First, Laquita Carter testified that she had a months-long relationship with Bumphus in 2023. JA2328-2329. She acknowledged that on June 23, 2023, Bumphus asked her to "come and get these guns" JA1988, JA3907. At first, Carter said she was busy with her hair; but Bumphus asked if she could do the errand before working on her hair, and she agreed. Carter picked up a bag and took it to Lux Auto. JA2329-2330. A surveillance video showed Bumphus removing the bag from her car at Lux Auto. JA2331. Next, the Government played a phone call in which Bumphus told Stepfon Bumphus not to bring his customers to Goldsboro (June 15, 2023) JA1960, JA3883. Finally, after his arrest, Bumphus called Moore from jail, asking Moore to take notes, presumably of amounts owed to him by 11 people (July 9, 2023). JA2042, JA3913.

## IV. Motion for judgment of acquittal, jury instructions, and verdict

After the conclusion of the evidence, the Government moved to dismiss Count 14 (possession with intent to distribute Psilocybin), which was granted. The trial court denied Bumphus's motion for judgment of acquittal on all remaining counts. JA3272. The trial court identified numerous people it considered to be employees, including: Carl Mitchell, Zuri Reeves, 10 flyers, Freddie Moore, Danielle Hartless, Laquita Carter, and Najae Vaughn, JA3257-3269. The court adopted the Government's response to Bumphus's motion, which, in addition to the individuals mentioned by the court, included Bumphus's brother, Stepfon Bumphus, as a person who was supervised. JA3236-3238, JA3272.

The trial court rejected defense counsel's request to instruct the jury that, with respect to CCE, it must unanimously agree on the specific five or more persons that the defendant organized, supervised, or managed. JA3305.

The jury acquitted Bumphus of possession with intent to distribute oxycodone (Count 13), and possession of a firearm in furtherance of drug trafficking with respect to June 22, 2023 (Count 18). JA3696. The jury found Bumphus guilty of all remaining counts.

## V. Post-trial motions and sentencing

After trial, Bumphus moved to dismiss Count 17 or 19, pursuant to the Double Jeopardy Clause of the Fifth Amendment because both counts charged him with

possession of a firearm in furtherance of a drug trafficking crime based on the same offense of possession with intent to distribute marijuana on July 5, 2023 (Count 12). JA3755. In the alternative, Bumphus argued that he should receive concurrent sentences on the two counts. JA3755. Bumphus acknowledged that this Court has upheld multiple §924(c) convictions based on one underlying offense in *United States v. Camps*, 32 F.3d 102 (4th Cir. 1994), *cert. denied*, 513 U.S. 1158 (1995), but wished to preserve his appellate rights. JA3756. The trial court denied the motion, relying on *Camps*. JA15.

Because Count 2, charging Bumphus with conspiracy to distribute a controlled substance, was a lesser included offense of CCE, the trial court vacated that count. (D.Dkt. 1538). The trial court noted, however, that should the CCE conviction be overturned on appeal, it would have the power to reinstate the conviction. (D.Dkt. 1538) (citing *United States v. Rutledge*, 517 U.S. 282 (1996); *United States v. Silvers*, 90 F.3d 95, 99-101 (4th Cir. 1996)) (D.Dkt. 1538).

The probation office applied the United States Sentencing Guidelines ("Guidelines" or U.S.S.G.") and grouped CCE (Count 1), conspiracy to launder money (Count 3), possession with intent to distribute marijuana (Count 15), felon in possession of a firearm (Count 16), and use of a communication facility in furtherance of drug trafficking (Count 20), for a base offense level of 38. JA3786. The base offense level was increased by 2 levels for obstruction of justice under

U.S.S.G. §3C1.1, for an adjusted total offense level of 40. JA 3787-3788. The probation office calculated eight criminal history points for a criminal history category of IV. JA 3794. The resulting Guidelines range was 20 years to life, plus 120 months consecutive for the two §924(c) convictions. JA3802.

The trial court sentenced Bumphus to an aggregate total sentence of 480 months of imprisonment. JA91. The sentence consisted of 360 months for CCE (Count 1), concurrent sentences of 120 months for conspiracy to launder money (Count 3), 60 months each for possession with intent to distribute marijuana (Counts 12 and 15), felon in possession of a firearm (Count 16), maintaining a drug involved premises (Count 20) and use of a communication facility for drug trafficking (Count 21). In addition, the trial court imposed consecutive 60-months sentences each for possession of a firearm in furtherance of drug trafficking (Counts 17 and 19). JA91.

## SUMMARY OF THE ARGUMENT

Bumphus's CCE conviction should be vacated because the evidence was insufficient for a jury to find that he organized, supervised, or managed, five or more people in the conspiracy, as required by 21 U.S.C. §848(c). Additionally, Bumphus's CCE conviction should be vacated because the district court refused to instruct jurors that they must unanimously agree on the specific five or more people he allegedly organized, supervised, or managed.

Bumphus's two convictions under 18 U.S.C. §924(c), for possession of a firearm in furtherance of the same drug trafficking crime, violates the Double Jeopardy Clause. Bumphus acknowledges this Court's contrary holding in *United States v. Camps*, 32 F.3d 102 (4th Cir. 1994), *cert. denied*, 513 U.S. 1158 (1995), but presents three arguments for vacating one of the §924(c) convictions or sentences. First, *Camps* does not apply to this case because, at the time of the decision, the statute only prohibited *use* and *carriage*, and not *possession* of a firearm. Second, even under *Camps*, the district court should have sentenced Bumphus for only one of the §924(c) convictions. Third, this Court should revisit its holding in *Camps*, which has been rejected by the First, Second, Third, Fifth, Sixth, Seven, Ninth, Tenth, Eleventh, and D.C. Circuits.

# ARGUMENT[2]

## I. The evidence was insufficient to show that Bumphus organized, supervised, or otherwise managed, five or more people with whom he was acting in concert to distribute marijuana.

### A. Standard of Review

This court reviews de novo, the district court's denial of a motion for judgment of acquittal. *See United States v. Kellam*, 568 F.3d 125, 132 (4th Cir. 2009). The verdict must be supported by "substantial evidence." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc) (citing *Glasser v. United States*, 315 U.S. 60, 80 (1942)). "Substantial evidence" is "evidence sufficient for a reasonable jury to find proof beyond a reasonable doubt of each element of the charged offense." *United States v. Zelaya*, 908 F.3d 920, 925-26 (4th Cir. 2018) (citing *United States v. Smith*, 451 F.3d 209, 216 (4th Cir. 2006)).

When reviewing for sufficiency of the evidence, this Court asks whether "*any* rational trier of fact could have found the essential elements of the crime [charged] beyond a reasonable doubt," *United States v. Johnson*, 54 F.3d 1150, 1153 (4th Cir. 1995) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 99 S. Ct.

---

[2] Because the trial court vacated Count 2 (conspiracy to distribute a controlled substance) as a lesser included offense of Count 1 (CCE), there is not, at this time, a judgment on Count 2 to challenge on this appeal. However, should this Court vacate Count 1, and the trial court reinstates Count 2 on remand, Bumphus does not waive his right to challenge a reinstated conviction on Count 2.

2781 (1979)) (emphasis in original). This court views the evidence and draws reasonable inferences in the light most favorable to the Government, as the prevailing party below. *Smith*, 451 F.3d at 216; *see also, Johnson*, 54 F.3d at 1153.

### B. Elements of Continuing Criminal Enterprise

21 U.S.C. §848 mandates a minimum punishment of 20 years, and up to life imprisonment, for any person who engages in a continuing criminal enterprise (CCE). A person is engaged in a CCE if—

> (1) he violates any provision of [the federal drug laws, *i.e.*,] this title or title III the punishment for which is a felony, and
>
> (2) such violation is part of a continuing series of violations of this title or title III—
>
> (A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and
>
> (B) from which such person obtains substantial income or resources.

21 U.S.C. §848(c).

With respect to the five or more persons, "[t]he defendant's relationships with the other persons need not have existed at the same time, the five persons involved need not have acted in concert at the same time or with each other, and the same type of relationship need not exist between the defendant and the five." *United States v. Butler*, 885 F.2d 195, 200 (4th Cir. 1989).

However, "the plain meaning of the phrase 'in concert' signifies mutual agreement in a common plan or enterprise . . . this element of the CCE offense requires proof of a conspiracy that would also violate §846." *Rutledge v. United States*, 517 U.S. 292, 300 (1996) (concluding that "conspiracy as defined in §846 does not define a different offense from the CCE offense defined in §848"). "To establish the existence of a narcotics conspiracy in violation of 21 U.S.C. §846, the Government must show an agreement between at least two people to violate narcotics law." *United States v. Eiland*, 738 F.3d 338, 358 (4th Cir. 2013) (citing *United States v. Baugham*, 449 F.3d 167, 171 (D.C. Cir. 2006)).

The defendant need not have personal contact with the five persons because, "organizational authority and responsibility may be delegated." *Butler*, 885 F.2d at 201; *United States v. Heater*, 63 F.3d 311, 317 (4th Cir. 1995). "Thus, a defendant may not insulate himself from CCE liability by carefully pyramiding authority so as to maintain fewer than five direct subordinates." *United States v. Ricks*, 882 F.2d 885, 891 (4th Cir. 1989).

In determining whether the defendant "organized," "supervised," or otherwise "managed" five people, these terms should be applied in their "ordinary sense as understood by the public or business community." *See Butler*, 885 F.2d at 200 (citations omitted). The Merriam-Webster dictionary provides the following definitions: "organizer" is "a person or thing that organizes something: such as . . .

a person who arranges something . . . especially by systematic planning and by coordinating the efforts of others."[3] "Supervise" is defined as "to be in charge of."[4] And "manage" means "to exercise executive, administrative, and supervisory direction."[5] The Cambridge Dictionary defines "supervise" as "to be responsible for the good performance of an activity or job, or for the correct behavior or safety of a person."[6] "Manager" is defined as "someone whose job is to control or organize someone or something, esp. a business"[7]

This Court has instructed that "[t]he 'usual and ordinary' meaning of manager or supervisor does not include a mere buyer-seller relationship. This is because buyer-seller relationships are not characterized by 'the exercise of power or authority.'" *United States v. Hall*, 93 F.3d 126, 130-31 (4th Cir. 1996).

Bumphus asserts there was insufficient evidence that he violated narcotics laws "in concert with five or more persons with respect to whom" he occupied a position of "organizer, a supervisory position, or any other position of management." 21 U.S.C. §848(c).

---

[3] https://www.merriam-webster.com/dictionary/organizer. Last visited August 16, 2026.
[4] https://www.merriam-webster.com/dictionary/supervise.
[5] https://www.merriam-webster.com/dictionary/manage.
[6] *See* https://dictionary.cambridge.org/dictionary/english/supervise.
[7] *See* https://dictionary.cambridge.org/dictionary/english/manager.

### C. The trial court erred in finding that Bumphus organized, supervised, or managed five or more people.

The Government presented evidence that in the beginning, Bumphus, Best, and Reeves, pooled their money to buy marijuana, distributed it, and used the proceeds to buy more marijuana. However, the relationships changed over time and provides important context from which to determine whether Bumphus exercised "power or authority" over other individuals. *See Hall*, 93 F.3d at 130-31.

The Government's strongest evidence of Bumphus's involvement was in the early years of the charged conspiracy. Reeves testified that they pooled their money to buy marijuana, sold it, and used the proceeds to buy more marijuana. JA1052. Best's role was to send the marijuana to Virginia and receive the money in California, JA1048, while Reeves and Bumphus sold the marijuana in Virginia. JA1051. But there is a dearth of evidence that Bumphus managed anyone during this time. Because the Government's investigation did not start until the summer of 2021, there were no videos or telephone intercepts. The Government's evidence from this period came from witness testimony. But neither Dasher, nor Reeves, nor Dozier, named anyone supervised by Bumphus.

A clear break occurred after Best was released from prison. Reeves gave Best all of his money and severed ties. JA1244-1248. Best and Reeves worked separately, each independently sending flyers to bring marijuana to Virginia. JA886. With this understanding, it would be nonsensical to attribute Reeves's flyers to Bumphus.

The Government produced no evidence that Bumphus had any active role in marijuana distribution while he was incarcerated for two years from October 2020 through October 2022. Although Reeves testified that he looked out for Best and Bumphus financially while they were incarcerated, Bumphus did not organize, supervise, or manage anyone during this time. This is critical, because many of the people the Government claims that Bumphus supervised were working for Reeves during Bumphus's two-year incarceration and were not managed by Bumphus.

When Bumphus was released in October 2022, Reeves and Bumphus no longer bought marijuana together from California. Bumphus did not purchase marijuana directly from California at all. Instead, he bought marijuana from Reeves. Again, there was no evidence that Bumphus had any supervisory authority over Reeves's people.

The Government's position, adopted by the trial court, was that individuals managed by someone else could be attributed to Bumphus by virtue of his upper-level position in the conspiracy. JA3238-3239. Bumphus rejects this. The five or more requirement is one of the criteria by which a jury determines if the CCE statute applies, and Government must prove beyond a reasonable doubt that Bumphus acted in concert with at least five individuals who he organized, supervised, or managed in the conspiracy. They may be managed directly or indirectly, but they must be in his chain of command, such that he exercised power or authority over them.

While the Government portrayed everyone working together under one umbrella, the testimony showed a messier reality. The people ostensibly working together often had their own businesses and competed with one another. It is not enough, therefore, to say that everyone transporting marijuana from California to Virginia could be counted as one of the five organized, supervised, or otherwise managed by Bumphus.

In denying Bumphus's motion for judgment of acquittal, the trial court adopted the Government's argument and identified the following people as employees: the 10 flyers, Zuri Reeves, Carl Mitchell, Danielle Hartless, Laquita Carter, Stepfon Bumphus, Najae Vaughn, Jamonte Stephens, and Freddie Moore. JA3257-3259, JA3236-3238, JA3272. As detailed below, there was insufficient evidence to support the trial court's conclusion that these people were organized, supervised, or managed by Bumphus.

*Flyers*—The trial court reasoned that, with regard to the airport interdictions, law enforcement "talked about 10 different flyers. And in the Court's view, flyers are part of employees in the CCE." JA3258. The trial court's conclusion was unsupported. While there was evidence that the flyers acted "in concert" to violate narcotics laws, this is insufficient; they must also have been organized, supervised, or otherwise managed by Bumphus. And here is where the Government's evidence failed. According to Dasher, the flyers were managed first by Best and, later, by

Reeves. At no time did Dasher or any of the flyers say that they worked for, or took orders from, Bumphus.

The flyers cannot be attributed to Bumphus for another reason. They were lumped together in one group despite evidence that people were using flyers outside the charged conspiracy. When Reeves severed ties with Best, they each organized their own flyers. JA886. Thus, Reeves's flyers cannot be attributed to Bumphus. But the Government did not distinguish who was flying for whom. Furthermore, Best and Reeves were not the only ones using flyers to transport marijuana. According to Reeves, Gay had his own business and did not work for Reeves. JA1239-1240. Yet Gay ("H" or "Hatch") was also using flyers for his own business. JA1853. For example, Brandon Martin testified that Mitchell and Gay used flyers to bring marijuana to Virginia independently of Best and Reeves. JA1474-1475.

In sum, Bumphus did not have supervisory authority over flyers at any time. Certainly, there was no evidence that he supervised anyone during his incarceration from October 2020 to October 2022, during which most of the airport interdictions occurred. After his release, he no longer purchased marijuana from California and would have had nothing to do with flyers. Furthermore, because the flyers were working for different and competing marijuana businesses, they cannot be grouped together as managed by any one person, and certainly not by Bumphus.

*Reeves*—The trial court stated that Reeves "was instructed by Mr. Bumphus as to how things worked early on." JA3257. But the testimony did not show that Bumphus had any supervisory or managerial authority over Reeves. Reeves testified:

Q. Did anyone show you how this worked?

A. Yes.

Q. Who was that?

A. Mr. Bumphus and Best.

Q. And when was that?

A. In 2018.

JA1064-1065. The trial court characterized this as "instruction," implying that Bumphus was Reeves's superior. But Reeves merely testified that Bumphus showed him how things worked, not that he was taking orders. Reeves himself testified that "[w]e were all equal." JA1105. They bought the marijuana together, split it into thirds, sold it, and used the proceeds to start over again. JA1051. Reeves's testimony that Bumphus showed him how it worked in the beginning was insufficient evidence from which to conclude that Bumphus supervised or managed him.

*Bumphus's Girlfriends*—With no justification, the trial court deemed Bumphus's girlfriend, Danielle Hartless, an employee. JA3265-3266. Hartless testified that she lived in the Goldsboro townhouse for seven years and dated Bumphus. JA2307-2308. They were no longer dating when she moved out in May

of 2023, but she allowed Bumphus to use the residence. JA2308-2309. There was nothing in the record to support the trial court's conclusion that she was involved in drug trafficking and was "part of the employee structure." JA3264. Hartless was not acting in concert with any narcotics conspiracy and therefore could not be counted as one of the supervisees. Furthermore, there was no evidence that Bumphus supervised Hartless.

Another girlfriend, Laquita Carter, was in a romantic relationship with Bumphus for a few months in 2023. JA3228-3229. The trial court's finding that Bumphus supervised Carter was based on a phone call in which Bumphus asked her to pick up some guns. JA3907. The phone call is not evidence of any supervisory role, but merely shows Bumphus asking his girlfriend for a favor. In the call, Carter says she is about to be busy with her hair. Bumphus asks Carter if she can take the bag for him before she starts working on her hair, and she agrees. This one phone call does not show that Carter is any kind of employee. It's simply a phone call from Bumphus asking his girlfriend for a favor.

*Carl Mitchell*—The trial court deemed Carl Mitchell an employee. JA3257. According to Dozier, Mitchell worked for Reeves. JA1697. However, while Mitchell assisted Reeves, JA1065, he also worked for Duwan King, JA1242, and also ran his own marijuana business using flyers to bring marijuana from California to Virginia, JA1467, and North Carolina. JA1384, JA1382-1384.

While there was evidence that Mitchell was heavily involved in marijuana trafficking, the Government failed to delineate what Mitchell did for Reeves, and what he did for others, including for himself. For example, Both Reeves and Dozier testified that Mitchell and Gay supplied Dozier behind Reeves's back. JA1126, JA1696. Mitchell himself was caught with 120 pounds of marijuana during a drug interdiction on December 23, 2022, at the Raleigh-Durham Airport. JA1375, JA1382-1384. This had nothing to do with Bumphus, as there was no evidence that Bumphus distributed marijuana outside of Virginia. At most, Reeves may have supervised Mitchell at one time, but none of the witnesses claimed that Bumphus supervised Mitchell.

*Jamonte Stephens and Najae Vaughn*—Stephens and Vaughn were arrested with Bumphus at the Goldsboro townhouse on July 5, 2023. There was evidence that Stephens and Vaughn were purchasing marijuana from Bumphus, but this Court has made clear that a buyer-seller relationship does not qualify as a supervisor or manager under the CCE statute. *See Hall*, 93 F.3d at 130-31 (stating that "[t]he 'usual and ordinary' meaning of manager or supervisor does not include a mere buyer-seller relationship"). The Government extracted numerous text messages between Bumphus and Vaughn with menus and prices. But this merely shows a buyer-seller relationship. There was no testimony or other evidence that Bumphus organized, supervised, or managed Stephens or Vaughn.

*Freddie Moore*—The trial court concluded that a phone call between Bumphus and Moore on July 9, 2023, four days after Bumphus's arrest in this case, shows that "Bumphus was running things when he was out and then when he's subsequently arrested." JA3263. In that call, Bumphus asks Moore to write down amounts he is owed from multiple people. JA3913. There is a social aspect to this call, as the phone was handed to a woman, who offers words of encouragement.

During the call, Bumphus asks Moore to write down a list of people and presumably amounts owed to him.[8] Moore, however, is not familiar with Bumphus's customers and states, "I ain't know what you had really goin' on though." JA3913. This makes clear that Moore was not part of Bumphus's business and was not supervised by him. However, Moore is willing to help Bumphus as a favor. After he takes notes, Moore asks, "do this . . . go to bruh or this go to me?" JA3917. Bumphus tells Moore to keep it for himself. Moore says that he doesn't really know any of the people, JA3918, another indication that he is not familiar with Bumphus's business. This call, does not show that Bumphus was supervising or managing Moore.

The trial court cast a wide net encompassing numerous people who, on closer examination, were not organized, supervised, or managed by Bumphus. To be sure, Bumphus was involved in, and associated with, people distributing large quantities

---

[8] One person Bumphus lists is "Laylo" or Najae Vaughn, further evidence that he had a buyer-seller relationship with Vaughn.

of marijuana. But that is not enough. The CCE statute mandates that, before imposing a 20-year minimum penalty, the Government must show that Bumphus acted in concert with at least five people that he organized, supervised, or managed. This, the Government failed to show and Bumphus's motion for judgement of acquittal on Count One should have been granted.

## II. Bumphus's conviction for Continuing Criminal Enterprise should be reversed because the district court refused to instruct the jury that it had to unanimously agree as to which five people Bumphus organized, supervised, or managed.[9]

### A. Standard of Review

Bumphus's challenge to the district court's jury instructions hinges upon legal considerations. This argument is reviewed either de novo or, alternatively, for abuse of discretion. *See United States v. Stitt*, 250 F.3d 878, 888 (4th Cir. 2001) ("We review allegations of a constitutionally defective jury instruction de novo."); *United States v. Hassler*, 992 F.3d 243, 246 (4th Cir. 2021) ("We review a district court's decision to give a particular jury instruction for abuse of discretion, and review whether a jury instruction incorrectly stated the law de novo.") (quoting *United States v. Miltier*, 882 F.3d 81, 89 (4th Cir. 2018)). Under either standard of review,

[9] Bumphus has this issue in common with Dilquon Best, Case No. 26-4105, with whom Bumphus was tried and whose appeal is pending in this Court. The following argument is largely reproduced with permission from appellate counsel for Mr. Best.

the Court will set aside a verdict if "'the erroneous instruction *seriously* prejudiced the challenging party's case.'" *Hassler*, 992 F.3d at 246 (quoting *Miltier*, 882 F.3d at 89) (emphasis in original).

### B. The district court committed reversible error by refusing Bumphus's request for a unanimity instruction.

Bumphus argued below that the specific five or more people he allegedly organized, managed, or supervised, must be unanimously agreed upon by the jury. During the charging conference, defense counsel asked the trial judge to instruct the jurors that they "must unanimously agree on the five or more persons." JA3302-3303.

Prosecutors opposed the request. JA3303. The Government directed the trial judge to *United States v. Stitt*, 250 F.3d 878 (4th Cir. 2001) and *United States v. Roane*, 378 F.3d 382 (4th Cir. 2004), as binding Fourth Circuit authority for the proposition that, as long as jurors unanimously conclude a defendant acted in concert with at least five persons, they need not unanimously agree on the identity of those five individuals. "Unanimous agreement on the identity of each supervisee is not required," the Government's counsel maintained. JA3303-3304. The trial judge sided with the Government and denied defense counsel's request for a unanimity instruction. JA3305.

Bumphus's conviction on Count One should be reversed for instructional error. Extending the Supreme Court's analysis in *Richardson v. United States*, 526

U.S. 813, 816 (1999), this Court should join the Court of Appeals for the Ninth Circuit in holding that a defendant is entitled to a specific unanimity instruction regarding the identities of the "five or more persons" he allegedly managed or supervised. *See* 21 U.S.C. §848(c).

The question presented here was left unresolved by the *Richardson* Court. The issue in *Richardson* was whether, in a CCE, trial jurors must reach unanimity on the particular "violations" which taken together satisfy the "series of violations" element of §848(c). The Government argued against imposition of any such unanimity requirement. A special unanimity instruction on the "series of violations" element (element two) was inappropriate, prosecutors urged, because unanimity is not necessary with respect to elements three, four, and five. In a majority opinion written by Justice Breyer, the Supreme Court rejected the Government's position and instructed the Seventh Circuit to review this instructional error for harmlessness on remand. *Richardson*, 526 U.S. at 824 (holding Section 848(c) "requires jury unanimity in respect to each individual 'violation'").

In reaching this conclusion, the Supreme Court explicitly declined to decide whether the Government was correct that no similar unanimity instruction was necessary with respect to the "five or more persons" elements of the same statute. *Richardson*, 526 U.S. at 824 ("Assuming, without deciding, that there is no

unanimity requirement in respect to these other provisions, we nonetheless find them significantly different from the provision before us").

As the Government pointed out during the charging conference below, JA3304-3305, this Court, in *Richardson's* wake, published two decisions which concededly undermine Bumphus's appellate position that he was entitled to a unanimity instruction on the "five or more persons" elements of §848(c). *United States v. Roane*, 378 F.3d 382, 399 (4th Cir. 2004); *United States v. Stitt*, 250 F.3d 878, 885-87 (4th Cir. 2001).[10] But neither of those opinions is dispositive because the standards of review in *Stitt* and *Roane* differed markedly from the standard which controls Bumphus's appeal.

Following his trial and conviction on a §848(a) charge, the defendant in *Stitt* assailed the district court's CCE instructions for the first time on appeal. Relying on *Richardson*, which post-dated his trial, Stitt argued his conviction should be vacated for plain error. Reversal was warranted because the trial judge ". . . did not instruct the jury that it had to be unanimous as to which three violations of Title 21 constituted the series of transactions that made up the CCE and as to which five

[10] The Fourth Circuit's longstanding view, as expressed in *Stitt* and *Roane*, aligns with that of the majority of circuits. *See, e.g., United States v. Rea*, 621 F.3d 595, 604 (7th Cir. 2010); *United States v. Hernandez-Vega*, 235 F.3d 705, 708 (1st Cir. 2000); *United States v. Harris*, 209 F.3d 156, 162 (2d Cir. 2000); *United States v. Long*, 190 F.3d 471, 475 (6th Cir. 1999); *United States v. Garcia Abrego*, 141 F.3d 142, 164 (5th Cir. 1998); *United States v. Rockelman*, 49 F.3d 418, 421 (8th Cir. 1995).

persons Stitt managed or supervised during the CCE," Stitt's counsel asserted. *Stitt*, 250 F.3d at 882.

Applying plain error review under Rule 52(b) of the Federal Rules of Criminal Procedure, the *Stitt* Court rejected this challenge to the trial court's CCE instructions. Unanimity is necessary under the Sixth Amendment on all essential elements of the offense, this Court reasoned. But the jury need not reach unanimity as to the identities of the five supervisees. Their identities are preliminary factual issues rather than statutory elements. "Accordingly," the Court wrote, "we conclude that the district court did not err by failing to give an instruction requiring that the jury agree unanimously on which five underlings Stitt managed, organized, or supervised." *Id.* at 887.

The Fourth Circuit echoed this conclusion three years later in *Roane*, 378 F.3d 382, when it denied a federal habeas corpus petition under 28 U.S.C. § 2255. The *Roane* Court summarily rejected the petitioner's instructional error argument, which he had not raised in the district court on either direct or collateral review. *Roane*, 378 F.3d at 399.

Unlike *Stitt* and *Roane*, the instant appeal is not delimited by the rigors of plain error review under Rule 52(b). Because Bumphus preserved this instructional issue at the charging conference below, it is subject to de novo scrutiny. Alternatively, the preserved objection is reviewable for abuse of discretion. *See*

*United States v. Hassler*, 992 F.3d 243, 246 (4th Cir. 2021); *Stitt*, 250 F.3d at 246 (reviewing preserved constitutional objection to instructions de novo). Examining Bumphus's §848(a) instructional argument through either appellate lens, the Court should overrule or distinguish *Stitt* and *Roane* and follow instead the better reasoned approach of the Ninth Circuit in *United States v. Jerome*, 942 F.2d 1328, 1330-31 (9th Cir. 1991).[11]

In *Jerome*, the defendant for the first time on appeal contended the trial judge erroneously failed to instruct jurors they must unanimously identify at least five persons he purportedly managed or supervised. The Ninth Circuit agreed, holding a trial court ". . . must give the jurors a specific unanimity instruction–that is the jurors had to be instructed that they must unanimously agree as to the identity of each of the five people [defendant] organized, managed or supervised." *Jerome*, 942 F.2d at 1331. The trial court's failure to deliver a unanimity instruction was sufficiently prejudicial to require reversal, even on plain error review. "The failure of the court so to instruct was highly prejudicial, with a high probability of substantially affecting the jury verdict," the Ninth Circuit aptly observed. *Id.*

---

[11] Even if, despite the different standard of review applicable here, the doctrine of interpanel accord prevents this Court from abrogating *Stitt* and *Roane*, Bumphus nonetheless advances this argument to preserve the point for en banc and certiorari purposes.

The Fourth Circuit should overrule or depart from its own precedent and embrace instead the *Jerome* Court's analysis. Here, just as in *Jerome*, "[t]he jury in this case was presented with a variety of persons that the prosecution told them could count in making up the five persons necessary to trigger the statute." *Jerome*, 942 F.3d at 1331. The specific unanimity instruction Bumphus requested would have ensured some jurors did not convict on the basis of one set of facts while others convicted ". . . on the basis of another set of facts." *Id.*

## III. Bumphus's two §924(c) convictions and sentences violate the Double Jeopardy Clause because both are predicated on the same drug trafficking offense.

### A. Standard of Review

Whether an indictment charges "one or more counts that are actually a single offense charged multiple times" is a question of law reviewed de novo. *See United States v. Shrader*, 675 F.3d 300, 313 (4th Cir. 2012) (citing *United States v. Goodine*, 400 F.3d 202, 207 n.7 (4th Cir. 2005)). Similarly, issues of statutory construction are reviewed de novo. *See United States v. Hall*, 972 F.2d 67, 69 (4th Cir. 1992); *United States v. Mitchell*, 39 F.3d 465, 468 (4th Cir. 1994).

### B. Double Jeopardy and Statutory Interpretation

The Double Jeopardy Clause of the Fifth Amendment provides that no person shall be "subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. This includes multiple punishments for the same offense in a

single proceeding. *See Jones v. Thomas*, 491 U.S. 376, 381 (1989); *Brown v. Ohio*, 432 U.S. 161, 165 (1977). Regarding interpretation of criminal statutes, Congress "remains free under the Double Jeopardy Clause to define crimes and fix punishments; but once the legislature has acted courts may not impose more than one punishment for the same offense." *Brown*, 432 U.S. at 165.

Double jeopardy is implicated when "(a) a defendant is charged under more than one statute covering the same conduct, or (b) a defendant is charged multiple times under the same statute for the same conduct." *United States v. Rentz*, 777 F.3d 1105, 1119 (10th Cir. 2015) (citation omitted) (Matheson, J., concurring). In the first category, courts apply the *Blockburger* test. *Id.* at 1119 (citing *Blockbuger v. United States*, 284 U.S. 299, 304 (1932) (stating that "the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not").

In the second category, involving multiple violations of the same statute, "courts determine whether a single offense is involved not by applying the *Blockburger* test, but rather by asking what act the legislature intended as the 'unit of prosecution' under the statute." *Id.* (citing *United States v. Weathers*, 186 F.3d 948, 952 (D.C. Cir. 1999)). The question is "whether Congress intended the facts underlying each count to make up a separate unit of prosecution." *Id.* at 1119 (quoting *United States v. Grimes*, 702 F.3d 460, 468 (8th Cir. 2012)). "If multiple

charges are based on the same single unit of prosecution, however, they run afoul of the Double Jeopardy Clause." *Id.* (citing *United States v. Woerner*, 709 F.3d 527, 539 (5th Cir. 2013)).

"When a defendant is charged with multiple violations of the same statute arising from the same course of conduct, the court must consider "[w]hat Congress has made the allowable unit of prosecution." *Shrader*, 675 F.3d at 313 (citing *Bell v. United States*, 349 U.S. 81 (1955)). And "to do so, we must look to the language of the statute, being mindful that any ambiguity must be resolved in favor of the defendant under the rule of lenity." *Id.* (quoting *United States v. Bennafield*, 287 F.3d 320, 323 (4th Cir. 2002)).

The rule of lenity is rooted in the principle that "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *United States v. Lanier*, 520 U.S. 259, 266 (1997). "[T]he canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered." *Id.* (citations omitted).

### C. The Fourth Circuit's Interpretation of §924(c)

18 U.S.C. §924(c)(1)(A) provides:

> [A]ny person who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, *or who, in furtherance of any such crime, possesses a firearm*, shall, in addition to the punishment provided for such crime of violence or drug trafficking

> crime—(i) be sentenced to a term of imprisonment of not less than 5 years . . .

18 U.S.C. §924(c)(1)(A) (emphasis added).[12] The statute requires a consecutive sentence of 7 years if the firearm is brandished, and 10 years if the firearm is discharged. *Id.*

In *United States v. Camps*, 32 F.3d 102, 107 (4th Cir. 1994), a panel of this Court held that multiple consecutive sentences could be imposed for multiple acts of firearm *use* or *carriage* arising out of a single predicate offense—in that case, a drug conspiracy. Camps was convicted of eight counts of violating §924(c) during the course of a drug conspiracy—one count for a shooting on December 1989; two counts for an ambush on January 7, 1990, involving two firearms; and five counts for a January 8, 1990, van stop at which police seized five firearms. *Id.* at 105. At sentencing, the convictions were grouped so that Camps received one consecutive sentence for the December 1989 incident, one consecutive sentence for the January 7, 1990, incident, and one consecutive sentence for the January 8, 1990, incident. *Id.*[13] Camps argued that multiple consecutive sentences could not be imposed for multiple §924(c) convictions arising out of a single predicate drug conspiracy.

---

[12] The italicized text was added by Congress in 1998. Pub. L. No. 105-386.

[13] For purposes of that case only, the government conceded that a defendant may not be punished multiple times for *simultaneous* firearm use or carriage. *Id.* at 109 n.9.

This Court examined the statute's text to delineate whether Congress intended the unit of prosecution to be the use or carriage of a firearm or, in the alternative, the underlying crime of violence or drug trafficking offense. "The test is whether the individual acts are prohibited, or the course of actions which they constitute. If the former, then each act is punishable separately." *Id.* at 108 (quoting *Blockburger v. United States*, 284 U.S. 299 (1932)). This Court concluded that "section 924(c)(1) prohibits each separate act of firearm use or carriage, not violent crimes and drug trafficking with firearms." *Id.* Therefore, multiple consecutive sentences were appropriate for multiple §924(c) convictions. *Id.* at 107.

In *Camps*, this Court rejected the Second and Sixth Circuits' determination that the statute's unit of prosecution was the underlying predicate and, therefore, multiple §924(c) convictions could not be sustained upon the same predicate. *Id.* at 109 (citing *United States v. Taylor*, 13 F.3d 986 (6th Cir. 1994)); *United States v. Lindsay*, 985 F.2d 666, 674-75 (2d Circuit 1993)). Instead, this Court found more persuasive that a defendant who has "used" or "carried" a firearm on several separate occasions during the course of a single continuing offense, has committed several §924(c)(1) offenses. *Camps*, 32 F.3d at 107 (citations omitted).

This Court reasoned that its interpretation best achieved the clear objective of Congress to deter the use of guns in a federal felony offense, *id.* at 108, and surmised

that Congress did not intend for the defendant to escape punishment for repeated firearms use during the course of a lengthy conspiracy. *Id.* at 108.

In a subsequent opinion, *United States v. Khan*, 461 F.3d 477 (4th Cir. 2006), this Court rejected the defendants' argument that they should not have been sentenced separately on multiple §924(c) convictions that were related to the same criminal episode. The defendants were convicted of various underlying predicate offenses having to do with conspiracy to wage armed conflict against the United States and against a country at peace with the United States. The defendants conceded that the underlying offenses themselves were distinct and did not violate the Double Jeopardy Clause. They argued, however, that multiple §924(c) convictions and sentences related to the same factual episode should not have been imposed. *Id.* at 494. This Court rejected the argument, explaining that "there is no housekeeping requirement . . . obliging either the government or the district court to present the facts in such a manner as to align the use of a particular firearm with a particular predicate offense." *Id.* at 494.

### D. Bumphus was erroneously convicted and sentenced for two §924(c) convictions predicated on the same underlying drug trafficking offense.

The jury convicted Bumphus of two counts of possession of a firearm in furtherance of a drug trafficking crime in violation of §924(c). JA384, JA386. The predicate drug trafficking crime for both Counts 17 and 19 is the same: possession

with intent to distribute marijuana on July 5, 2023. Bumphus was charged with and convicted of a single count of possession with intent to distribute marijuana on July 5, 2023 (Count 12). JA379. Thus, both Counts 17 and 19 are predicated on Count 12. Before trial, Bumphus moved to dismiss Count 17 as multiplicitous, JA350, which was denied, JA1. After trial, Bumphus again moved to dismiss Count 17 or 19 or, in the alternative, for concurrent sentences (D.Dkt 1635), which was denied. JA15. The trial court rejected Bumphus's argument that the two §924(c) convictions, predicated on the same underlying offense, violated the Double Jeopardy Clause. JA15.

Bumphus presents three reasons for vacating one of his §924(c) convictions. First, *Camps* is inapplicable to Bumphus's convictions for possession; second, *Camps* does not support separate sentences for simultaneous possession of firearms; and, third, this Court should revisit its ruling in *Camps* and join the majority of circuits which apply the rule of lenity to limit §924(c) convictions to one use, carry, or possession for each underlying crime of violence or drug trafficking crime.

**1. *Camps* is inapplicable to Bumphus's §924(c) convictions for *possession* of a firearm in furtherance of drug trafficking because the statute did not criminalize possession when *Camps* was decided.**

At the time of the *Camps* decision, §924(c) only prohibited the *use* and *carrying* of a firearm, and not *possession*.[14] Upholding multiple consecutive sentences for multiple §924(c) violations predicated on one underlying offense, this Court reasoned that, "[a] defendant who has 'used' or 'carried' a firearm on several separate occasions during the course of a single continuing offense, therefore, has committed several section 924(c)(1) offenses." *Camps*, 32 F.3d at 107.

Subsequently, the Supreme Court interpreted "use" to require "active employment" that makes the firearm an operative factor in the predicate offense. *Bailey v. United States*, 516 U.S. 137, 143 (1995). In response, Congress amended §924(c) to include passive *possession* of a firearm. Pub. L. No. 105-386; *see also United States v. Lomax*, 293 F.3d 701 (4th Cir. 2002) (discussing amendment to §924(c) after *Bailey*).

This Court's decision in *Camps* was anchored in each use or carriage being a defined separate act. "[S]ection 924(c)(1) prohibits each separate act of firearm use or carriage, not violent crimes and drug trafficking with firearms. Each separate act

[14] At the time of the *Camps* decision, §924(c) provided that, "whoever, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years . . . " *Camps*, 32 F.3d at 107-07 (emphasis omitted).

of firearm use or carriage, therefore, is separately, and consecutively, punishable." *Camps*, 32 F.3d at 108.

While a defendant's "use" and "carriage" of a firearm may have a natural beginning or ending subject to being enumerated, possession is different. This is evident from this Court's reasoning when determining the unit of prosecution under 18 U.S.C. §922(g), prohibiting possession of a firearm or ammunition by nine classes of people. In *United States v. Dunford*, 148 F.3d 385 (4th Cir. 1998), six guns and ammunition were seized from the house of the defendant, who was both a felon and an illegal drug user—two classes prohibited from possessing a firearm. For each gun, the defendant was convicted of violating two counts of §922(g), one for each prohibited class. Six guns and ammunition resulted in fourteen convictions under §922(g).

This Court reversed, concluding the defendant could receive only one §922(g) conviction. First, the Court held that each firearm could not lead to two §922(g) convictions resulting from the defendant's status as a member of two prohibited classes. *Id.* at 389. Next, this Court considered the simultaneous possession of six different firearms. This Court noted that:

> The prohibited conduct—possession of any firearm or ammunition—could arguably occur every time a disqualified person picks up a firearm even though it is the same firearm or every time that person picks up a different firearm. The language does not delineate whether possession of two firearms—say two six-shooters in a holster—

> constitutes one or two violations, whether the possession of a firearm loaded with one bullet constitutes one or two violations, or whether possession of a six-shooter loaded with six bullets constitutes one or two or seven violations.

*Dunford*, 148 F.3d at 389. This Court stated that, "when such ambiguity exits, we are instructed that such 'ambiguity should be resolved in favor of lenity.'" *Id.* at 390. Applying the rule of lenity, this Court concluded that the possession of the six firearms could support only one conviction under §922(g). *Id.*

While *Dunford* addressed a different code section, similar concerns persist for possession of a firearm under §924(c). In Bumphus's case, if there had been ten firearms at the Dorothy house and another ten firearms at the Goldsboro house, Bumphus could have been convicted of 20 counts of violating §924(c) based on one underlying count of possession with intent to distribute marijuana. At the time of the *Camps* decision, this Court determined the unit of prosecution to be the "use" or "carriage" of a firearm, which lends itself to having a beginning and end. And there is a natural limit to the number of firearms one can use or carry in furtherance of any crime of violence or drug trafficking offense. The same is not true for possession. Because possession of a firearm was added to §924(c) after the decision in *Camps*, it should not apply in this case.

In *Dunford*, this Court held that §922(g) left too much ambiguity as to the number of convictions permitted under the statute based on simultaneous possession of multiple firearms and multiple prohibited statuses. Therefore, under the rule of

lenity, this Court concluded that §922(g) allowed only one conviction. Because the same ambiguity exists for possession under §924(c), this Court should similarly hold that there can only be one conviction for possession based on one underlying drug offense.

#### 2. *Camps* does not mandate two consecutive sentences for simultaneous possession of two firearms under §924(c).

Prior to sentencing, Bumphus filed Defendant's Motion to Dismiss Count 17 or 19, or in the alternative, Motion for Concurrent Sentences. JA3755. The trial court denied the motion, relying on this Court's opinion in *Camps*. JA15. As explained above, *Camps* did not address the unit of prosecution in possession cases. *Camps* also did not address the imposition of consecutive sentences for simultaneous possession of firearms. The defendant in *Camps* was convicted of eight counts of violating §924(c), but received three—and not eight—consecutive sentences. The Government conceded and this Court accepted, for purposes of deciding that case only, that "a defendant may not be punished multiple times for *simultaneous* firearm usage or carriage." *Camps*, 32 F.3d at 109 n.9 (emphasis in the original). Therefore, multiple convictions under §924(c) for simultaneous use merged for sentencing purposes.

In this case, Counts 17 and 19 should similarly merge for sentencing purposes. Both counts charge possession of a firearm predicated on a single count of possession with intent to distribute drugs on July 5, 2023. Bumphus was not arrested

in actual possession of any firearm and was convicted of two §924(c) counts based on simultaneous constructive possession of two firearms. The trial court's denial of Bumphus's motion for concurrent sentences was not supported by *Camps*, where only one sentence was imposed for simultaneous use or carry. Under the trial court's reasoning, for example, a defendant could receive consecutive sentences for every firearm in a gun collection. But *Camps* does not stand for this proposition. Accordingly, the trial court erred in imposing consecutive sentences for the two §924(c) convictions.

**3. This Court should revisit its ruling in *Camps*, rejected by ten sister circuits, upholding multiple convictions or sentences under 924(c), predicated by one underlying drug trafficking crime.**

In *Camps*, this Court held that the unit of prosecution was *using* and *carrying* a firearm, and not the underlying *crime of violence or drug trafficking crime*. Thus, a defendant charged with a single underlying offense may be convicted under §924(c) of an unlimited number of uses or carries attached to that offense. The Court of Appeals for the Eighth Circuit subscribes to this view. *See United States v. Lucas*, 932 F.2d 1210 (8th Cir. 1991) (holding that separate uses of different firearms support separate §924(c) charges even if both relate to the same predicate offense).

The Fourth and Eighth Circuits are alone in this interpretation. Ten other circuits have held that the unit of prosecution is the underlying offense or that the statute is too ambiguous and, therefore, the rule of lenity must be applied to limit the

number of §924(c) convictions to one per underlying offense. *See United States v. Pena-Lora*, 225 F.3d 17, 37 (1st Cir. 2000) (stating that "the imposition of consecutive sentences under subsection 924(c) for using multiple weapons during a single crime of violence would impinge upon fundamental "double jeopardy" principles); *United States v. Lindsay*, 985 F.2d 666, 675 (2d Cir.) (applying rule of lenity to hold that "that a defendant who uses multiple firearms in relation to a single drug-trafficking crime may be charged with only one violation of §924(c)(1)"), *cert. denied*, 510 U.S. 832 (1993); *United States v. Diaz*, 592 F.3d 467 (3d Cir. 2010) (applying rule of lenity to hold that multiple §924(c) convictions may not be predicated on the same underlying drug offense); *United States v. Privette*, 947 F.2d 1259, 1262-63 (5th Cir. 1991) (concluding that "to avoid violating double jeopardy principles each firearms offense must be sufficiently linked to a separate drug trafficking offense to prevent two convictions under §924(c) on the same drug offense"), *cert. denied*, 503 U.S. 912 (1992); *United States v. Taylor*, 13 F.3d 986 (6th Cir. 1993) (concluding that "§924(c)'s unit of prosecution is the underlying offense, not the number of firearms"); *United States v. Cappas*, 29 F.3d 1187, 1189 (7th Cir. 1994) (holding that use of multiple guns in a single conspiracy will not support multiple convictions under §924(c)); *United States v. Smith*, 924 F.2d 889 (9th Cir. 1991) (holding that each §924(c) conviction must be supported by a separate predicate offense); *United States v. Rentz*, 777 F.3d 1105 (10th Cir. 2015) (en banc)

(holding that a defendant could be convicted of only one §924(c) violation even though a single use resulted in two predicate convictions); *United States v. Hamilton*, 953 F.2d 1344 (11th Cir. 1992) (holding that multiple sentences for three §924(c) convictions could not be supported by a single predicate drug conspiracy); *United States v. Anderson*, 59 F.3d 1323 (D.C. Cir.) (en banc) (applying the rule of lenity to hold that only one §924(c) violation may be charged in relation to one predicate crime), *cert. denied*, 516 U.S. 999 (1995).

The Fourth Circuit's interpretation of §924(c) has led to anomalous results. *Camps* itself is internally inconsistent. The defendant in Camps was convicted of eight counts of §924(c), each requiring a minimum consecutive sentence. However, perhaps anticipating an unjust result, the Government conceded, and this Court accepted, that Camps should be sentenced once for each episode regardless of the number of firearms involved—resulting in only three consecutive sentences.

On the other hand, in *United States v. Khan*, 461 F.3d 477 (4th Cir. 2006), *cert. denied*, 550 U.S. 956 (2007), this Court upheld multiple consecutive sentences where four predicate offenses *could have* supported multiple §924(c) convictions, even if the indictment did not tie each §924(c) charge to a particular predicate. Dissenting, Judge Goodwin departed from the majority because he would have merged Khan's three §924(c) convictions for sentencing. Judge Goodwin observed that, "[u]nder the majority's reasoning, no boundaries exist for §924(c) prosecutions.

That is, a drug conspirator could pick up a gun, place it on the table to scratch his nose, pick it back up, and receive two §924(c) sentences. Likewise, a defendant could carry three dangerous weapons at one time, [and] be convicted of three §924(c) sentences . . . " *Id.* at 503 (Goodwin, J., dissenting).

Then, in *Hahn v. Moseley*, 931 F.3d 295 (4th Cir. 2019), this Court reviewed a petition for writ of habeas corpus under 28 U.S.C. §2255, for a petitioner whose convictions arose out of the Tenth Circuit. This Court granted the writ after recognizing that, under Tenth Circuit precedent, one possession tied to two underlying offenses can support only one §924(c) conviction. Ironically, a petitioner with convictions arising out of the Fourth Circuit would not have received the same treatment.

Depending on which argument will yield the greatest number of convictions in case at hand, the Government has argued that the unit of prosecution is the number uses, carries, or possessions, *see, e.g., Diaz*, 591 F.3d at 471 (Government arguing that the unit of prosecution is each use, carry, or possession), or the underlying predicate, *see Rentz*, 777 F.3d at 1114 (Government arguing that the unit of prosecution is the predicate offense, which can be more than one per firearm use).

Bumphus urges this Court to take a more principled approach. In *Camps*, this Court reasoned that the statute criminalizes the use or carry of a firearm and not the underlying predicate offense. 32 F.3d at 108. This is true. But what Congress

intended to be the unit of prosecution is a different question. To violate the statute, there must be:

> A—use, carry, or possession of a firearm, and
>
> B—the use or carry must be during and in relation to a crime of violence or drug trafficking crime or possession must be in furtherance of such a crime.

Congress could choose the unit of prosecution to be A, or B, or A + B. *See Rentz*, 777 F.3d at 1117 (Matheson, J., concurring). The Fourth Circuit decided A to be the unit of prosecution. *Camps*, 32 F.3d at 107. Extending the reasoning, this Court held that each separate act of firearm use or carriage is separately and consecutively punishable. *Camps*, 32 F.2d at 108. The Court believed that this interpretation best achieved §924(c)'s objective of deterring gun use during a federal felony. *Id.*

Ten circuits have concluded otherwise. The Second Circuit found more significant, the connection required between the firearm and the underlying crime, and surmised that Congress likely considered the underlying crime to be the unit of prosecution. *Lindsay*, 592 F.3d at 672 (citation committed). Finding the statutory language ambiguous, however, the court applied the rule of lenity to hold that a defendant may be charged with only one §924(c) violation in relation to a single drug trafficking crime. *Id.* at 676.

While the more usual case involves multiple §924(c) convictions for multiple firearms, the Court of Appeals for the Tenth Circuit reviewed the more unusual case of one firearm use giving rise to two predicate offenses. In that case, the defendant's

single gunshot struck two people, killing one and wounding another. *Rentz*, 777 F.3d 1105. The defendant was charged with two predicate offenses—murder and attempted murder—and charged with one §924(c) for each predicate. The Tenth Circuit held that there could only be one §924(c) conviction for one use of a gun, even if it resulted in two predicate offenses. *Id.* at 1114-15.

With the statutory text lending itself to different units of prosecution and, with little guidance from the legislative history,[15] this Court should apply the rule of lenity. The Supreme Court has stated that, "if Congress does not fix the punishment for a federal offense clearly and without ambiguity, doubt will be resolved against turning a single transaction into multiple offenses." *Bell v. United States*, 349 U.S. 81, 84 (1955). The Court has reiterated that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Cleaveland v. United States*, 531 U.S. 12, 25 (2000) (internal quotations omitted).

As the Second Circuit concluded, "[s]ince congress failed to specify the firearm as the appropriate unit of prosecution under §924(c)(1), we invoke the rule of lenity . . . and conclude that a defendant who uses multiple firearms in relation to

[15] This and other circuits have noted that the legislative history of §924(c) is sparse and not particularly helpful in discerning Congress's intent regarding the unit of prosecution. *Camps*, 32 F.3d at 107 n.6.; *see, e.g., Lindsay*, 985 F.2d at 676; *Anderson*, 59 F.3d at 1327.

a single drug-trafficking crime may be charged with only one violation of §924(c)(1)." *Lindsay*, 985 F.2d at 675.

Similarly, the D.C. Circuit noted that one side of the debate emphasizes "uses or carries" and the other emphasizes "during and in relation to any crime of violence or drug trafficking crime." *Anderson*, 90 F.3d at 1326. The court concluded that, at a minimum, the statute is ambiguous and applied the rule of lenity. *Id.*

Bumphus urges this Court to recognize the ambiguity in the language of §924(c) and similarly apply the rule of lenity to restrict convictions under §924(c) to one conviction for each use, carry, or possession, tied to a separate underlying crime of violence or drug trafficking offense. Doing so does not weaken the statute's effectiveness. In Bumphus's case, the Government could have charged a second underlying count of possession with intent to distribute marijuana at the Dorothy location where the second firearm was found, but chose not to. In drug trafficking conspiracies, the Government need only connect each §924(c) charge to a particular drug transaction, evidence of which the Government usually has in abundance. Applying the rule of lenity merely clarifies, for the sake of all concerned, how a §924(c) offense is to be charged.[16]

---

[16] Bumphus acknowledges that *Camps* is binding precedent, but wishes to preserve the issue for en banc or certiorari purposes. *See United States v. Gugliemi*, 819 F.2d 451, 457 (4th Cir. 1987) (noting that only an en banc court may overturn a previous panel's published decision).

## CONCLUSION

For the foregoing reasons, Bumphus respectfully requests that this Court reverse his convictions for CCE and one count of violating 18 U.S.C. §924(c).

## REQUEST FOR ORAL ARGUMENT

Appellant respectfully requests an opportunity for oral argument in support of this appeal.

Respectfully Submitted,

S/*Sicilia C. Englert*

Sicilia C. Englert
Law Office of Sicilia C. Englert, LLC
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
(703) 636-2261

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

**No.** 25-4699 **Caption:** US v. Cortez Bumphus

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2) & 40(d)(3).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

☑ this brief or other document contains 12,412 [*state number of*] words

☐ this brief uses monospaced type and contains ______ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

☑ this brief or other document has been prepared in a proportionally spaced typeface using MS Word [*identify word processing program*] in Times New Roman, 14 pt. [*identify font size and type style*]; **or**

☐ this brief or other document has been prepared in a monospaced typeface using ______ [*identify word processing program*] in ______ [*identify font size and type style*].

(s) Sicilia Englert

Party Name appellant

Dated: 9/16/2026